IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| STATE OF HAWAI'I,<br><br>Plaintiff,<br><br>vs.<br><br>CHARLES ERIC BROUGHTON,<br>Also known as Eric Broughton,<br><br>Defendant. | CR. NO. ______________<br><br>**DECLARATION OF COUNSEL** |

**DECLARATION OF COUNSEL**

1. I am an attorney for Defendant Commander Charles Eric Broughton in the above-entitled ease. I set forth the following facts upon information and belief as learned from discussions with my client and review of relevant discovery:

2. Commander Broughton is a DHS federal law enforcement officer currently serving as the Federal Protective Service ("FPS") Area Commander in the Pacific Islands Area, Region 9.

3. On December 20, 2012, Broughton reported an aggressive driving incident with Mario Ybarra ("Ybarra"), a soldier stationed in Hawaii. The incident occurred during Broughton's commute home in his authorized Home-to-Work vehicle, a white Chevrolet Tahoe with FPS and DHS markings and law enforcement

lights. Commander Broughton was in full uniform at the time of the incident and was in an "in service" status available to respond to emergency calls from the FPS MegaCenter.[1]

4. While Commander Broughton was driving along H2 on Oahu, Hawaii, a white vehicle began tailgating him. Commander Broughton turned on his rear emergency lights in an effort to warn the driver. As Commander Broughton was exiting the freeway Ybarra, the driver of the white vehicle, pulled up next to Commander Broughton and leaned over the passenger side of his vehicle and "began violently displaying his middle finger" and yelling. Due to the location of the altercation on H2, Commander Broughton suspected that Ybarra was a military member and he assumed that Ybarra was heading to the Army installation located off of H2. Commander Broughton decided to report Ybarra's behavior, violation of 18 USC III and suspected anger management/PTSD to his military commander.

5. Commander Broughton followed Ybarra to obtain his license plate and registered owner information from FPS dispatch. Thereafter, Ybarra abruptly stopped in the middle of traffic lane and proceeded to leave his vehicle and approach Commander Broughton's driver side window, while yelling at him. When

---

[1] FPS utilizes communication centers called MegaCenters to communicate with its law enforcement personnel while they are in the field. The State of Hawaii falls under the responsibility of the Denver MegaCenter.

Commander Broughton saw Ybarra approaching the vehicle, fearing that Ybarra may have been armed Broughton removed his service weapon from its holster and placed it above his lap, in a tactical ready position. Commander Broughton stated that he returned the weapon to its holster once he determined that Ybarra was unarmed.

6. Ybarra alleges that Commander Broughton placed his service weapon on his chest and asked Ybarra "if he had a problem." Ybarra claims that at that point he raised his arms, went back to his car, and departed the area. Soon after the encounter, Ybarra called 911 and reported the incident to the HPD. He also filed a complaint with FPS, which was recorded by the MegaCenter. On the contrary, Commander Broughton adamantly denies that he raised his weapon and certainly did not point it at any part of Ybarra's body.

7. Pursuant to 28 C.F.R. § 50.15(a), federal employees may be provided representation in criminal proceedings in which they are charged in their individual capacities "when the actions for which representation is requested reasonably appear to have been performed within the scope of the employee's employment and the Attorney General or his designee determines that providing representation would otherwise be in the interest of the United States."

8. Commander Broughton's actions were performed within the scope of his employment as a Federal FPS law enforcement officer. Included among the

enumerated police powers of an FPS law enforcement officer is the power to make arrests without warrant for misdemeanors committed in their presence and felonies based on probable cause. 41 U.S.C. § 1315 (b) (2) (c).

9. While Commander Broughton's concern was for the safety of Ybarra, his passenger and other drivers, Ybarra's tailgating of Commander Broughton's marked Chevrolet Tahoe, aggressive hand gestures and stopping in roadway thereby blocking Commander Broughton's vehicle, reasonably constituted a violation of the 18 U.S.C. § 111 (b)'s prohibition against assaulting, intimidating or interfering with a federal officer.

10. Commander Broughton was engaged in his authorized home to work commute in a government issued and marked law enforcement vehicle, while in full uniform. All expenses associated with his home-to-work commute, including fuel and vehicle maintenance are paid for with a General Services Administration vehicle fleet card. While not in a pay status during his commute, he is considered "in service." As such, he is required to check on and off the air with his locations when beginning and ending the commute, he is subject to dispatch and performance of law enforcement functions as directed, and he must respond to emergency situations or threats if warranted.

11. Moreover, the DHS Home-to-Work directive recognizes that a law

enforcement employee who is authorized home-to-work transportation occupies "a position for which transportation between the employee's residence and various locations is essential to the safe and efficient performance of those [law enforcement] duties. Moreover, the directive makes it clear that the home-to-work vehicle is only for official use and that it is not for the convenience or comfort of the employee.

12. Commander Broughton was driving his government issued law enforcement vehicle in an authorized home-to-work status and was acting within the scope of his duties when Ybarra tailgated Broughton. Ybarra was technically in violation of 18 U.S.C. § 111 once he began displaying aggressive behavior toward Broughton, and was subject to arrest by Broughton as discussed above. Broughton was in a law enforcement status as soon as he began to respond to Ybarra's aggressive behavior, bringing him clearly into the scope of his employment.

13. When Ybarra exited his car and approached Broughton's vehicle, Broughton contacted the FPS MegaCenter in Denver and told the dispatcher that he was "having a problem with someone on the roadway." Using the radio and reporting the incident is clearly engaging in a law enforcement function. It was after this point that Ybarra claims Broughton's weapon was stuck in his chest. When Broughton called the dispatcher back he asked her to run the license plate of the car. Broughton followed up with the dispatcher a few minutes later and asked her to create an

incident report. Lastly, when Broughton reported Ybarra's conduct to the Military Police and Ybarra's Commanding Officer, he was doing so in a law enforcement capacity.

14. In fact this conclusion and finding was indeed determined by the Department of Justice ("DOJ") after a request was made by Commander Broughton for DOJ representation was made. By letter dated January 4, 2013, Robert D. Paschall, Associate General Counsel for General Law, Homeland Security, concluded that Commander Broughton "was performing a law enforcement function and Ybarra's allegations relate to matters that occurred while [Commander] Broughton was within the scope of his employment."

I DECLARE UNDER PENALTY OF LAW THAT THE FOREGOING FACTS ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

Executed on: April 16, 2013.

/s/ William A. Harrison
WILLIAM A. HARRISON
Attorney for Defendant
CHARLES ERIC BROUGHTON