Law Offices Of:
HARRISON & MATSUOKA

WILLIAM A. HARRISON    #2948
841 Bishop Street, Suite 800
Davies Pacific Center
Honolulu, Hawaii  96813
Telephone Number:   523-7041
Facsimile Number:  538-7579
E-Mail:  wharrison@hamlaw.net

Attorney for Defendant
CHARLES ERIC BROUGHTON

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| STATE OF HAWAI'I, | )  CR. NO. 13-00415 HG |
| | ) |
| Plaintiff, | )  **MEMORANDUM IN SUPPORT OF** |
| | )  **MOTION TO DISMISS** |
| vs. | ) |
| | ) |
| CHARLES ERIC BROUGHTON, | ) |
| Also known as Eric Broughton, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

## I.      SUMMARY OF ARGUMENT

In the instant case, where Commander Broughton could prove that he

reasonably believed that his actions were necessary and proper in the performance of his duties, he would be completely immune to criminal liability. This is an extension of the principle that "the government of the United States in the exercise of all powers conferred upon by the Constitution," is supreme to the states. *In re Neagle*, 135 U.S. 1, 62 (1890). Accordingly, it is well established that if a federal officer

> is held in the state court to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do . . . and if in doing that act, he did no more than what was necessary and proper for him to do, he cannot be guilty of a crime under the law of [any] state . . . there is no occasion for any further trial in the state court, or in any court.

*Id.*, at 75; *see also Clifton v. Cox,* 549 F.2d 722, 730 (9th Cir. 1977) recognizing that under proper circumstances the Supremacy Clause provides immunity to a federal official from state criminal laws; *Whitehead v. Senkowski*, 943 F.2d 230, 233-34 (2nd Cir. 1991) (same); *Kentucky v. Long,* 837 F.2d 727, 744 (6th Cir. 1988) (same).

## II.   PROCEDURAL AND FACTUAL BACKGROUND

### A.   PROCEDURAL BACKGROUND

On March 19, 2013, the State of Hawaii ("State") filed obtained an Indictment against Commander Broughton in the Circuit Court of the First Circuit, State of Hawaii, charging him with Terroristic Threatening in the First

Degree, in violation of Hawaii Revised Statute ("HRS") § 707-716. On March 28, 2013, Commander Broughton appeared in the Circuit Court of the First Circuit for arraignment. Commander Broughton pled not guilty to the charge.

On April 19, 2013, Commander Broughton filed a Notice of Removal pursuant to 28 U.S.C. § 1442(a) (1). (ECF No. 1.)

On May 10, 2013, the State of Hawaii filed an "Opposition to Defendant's Notice of Removal of State Prosecution." (ECF No. 4.) The Court construed the State's filing as a Motion for Remand to State Court. (ECF No. 15.)

On June 6, 2013, Commander Broughton filed an Opposition to the State's Motion for Remand. (ECF No. 12.)

On June 13, 2013, the State filed a Reply. (ECF No. 13.)

On June 19, 2013, the Court held an evidentiary hearing on the Motion for Remand as contemplated by 28 U.S.C. § 1446(c) (5). At the hearing on June 19, 2013, counsel agreed on the record that the Court decide the Motion for Remand based on the pleadings, memoranda, and argument. (ECF No. 15.)

On June 28, 2013 the Court issued its Order denying Plaintiff's Motion for Remand to the State Court. (ECF No. 15.) In its Order the Court found:

(1)     Commander Broughton was a "Federal Law Enforcement Officer with the Department of Homeland Security" who at the time of the alleged offense was "serving as the Federal Protective Service Area

Commander in the Pacific Islands, Area Region 9;"

(2)     Commander Broughton was acting under color of office as "there was a causal connection or nexus between Officer Broughton's actions on December 20, 2012, as a federal officer, and the criminal charge pending against him. Officer Broughton is being charged with a crime that was allegedly committed while in the course of investigating a traffic violation, based on reasonable suspicion, while he was driving his official FPS vehicle, in uniform, while engaged in his authorized work-to-home commute;" and

(3)     Commander Broughton raised a colorable federal defense which may shield him "from criminal liability if he can prove that he reasonably believed that his actions were necessary and proper in the performance of his duties. (ECF No. 15.)

## B.     FACTUAL BACKGROUND

### Undisputed facts:

On December 20, 2012 at approximately 3:15 pm, Officer Charles Eric Broughton ("Defendant" or "Officer Broughton") encountered a car driven by Mario Ybarra ("Ybarra"). Officer Broughton was driving home from work, and both drivers were traveling northbound on H2 Freeway. Officer Broughton was traveling unaccompanied in his authorized home-to-work vehicle, a white Chevrolet Tahoe Sports Utility Vehicle ("SUV") with Federal Protective Services

("FPS") and Department of Homeland Security ("DHS") markings on the sides. Ybarra was driving a BMW convertible and his wife, Wendy Ybarra, was sitting in the passenger's seat. (ECF No. 15.)

### State of Hawaii's version of facts:

Ybarra claims that he was following Commander Broughton's SUV on the H2 Freeway, and after the SUV suddenly slowed from 60-65 mph to 50 mph, Ybarra also slowed by braking. At the same time, a black truck behind Ybarra's BMW began flashing its lights. Ybarra activated his turn signal intending to change lanes, and the black truck similarly activated its signal to change lanes. As Ybarra proceeded to change lanes, Officer Broughton activated his roof-top emergency light bar.

Ybarra maintains that Officer Broughton's white SUV took the Mililani Mauka exit off the H2 Freeway, and that is when Ybarra saw the SUV's Department of Homeland Security label on the side of the vehicle. Ybarra continued on H2 and exited the freeway at the Mililani Tech Park exit. Moments later, Wendy noticed Broughton's SUV approaching them from behind.

Ybarra claims Broughton then pulled up next to Ybarra on Kamehameha Highway and motioned for Wendy to roll down her window. After Wendy rolled down her window, Broughton yelled: "Hey you got a fucking problem with me?" Wendy and Ybarra observed Broughton in his Department of

Homeland Security uniform at this point. Wendy replied, "No." Broughton then asked, "You need to say something to me." Wendy replied, "No." Broughton continued to ask "is there something you need me to do?" Wendy responded, "No, just leave us alone."

Ybarra claims Broughton continued to follow them. At a stop light on Kamehameha Highway, Ybarra stopped his vehicle to obtain Broughton's name and badge number. When Ybarra approached Broughton's window, he asked for Broughton's name and badge number. Broughton had his gun displayed on the center part of the steering wheel and tapped his gun on the steering wheel, drawing Ybarra's attention to the gun. Ybarra put both hands in the air and told Defendant he was required to provide the requested information. Broughton then stuck his gun in the center of Ybarra's chest and asked if they had a problem. Ybarra responded that there was no problem and returned to his car with his hands still in the air. After this incident, Ybarra called 911 to report the incident to the Honolulu Police Department. (ECF No. 15.)

### **Commander Broughton's Version of Events**

Officer Broughton claims Ybarra began tailgating him while driving on the H2 Freeway, and he turned on his rear emergency lights in an effort to warn Ybarra.

Broughton claims that after he turned off his lights, while still on the H2 Freeway, Ybarra pulled up next to him and leaned over the passenger side of his

vehicle and began violently displaying his middle finger and yelling.

Broughton suspected Ybarra was a military member due to their location, near an Army installation located off of the H2 Freeway. Broughton decided to report Ybarra's behavior to his military commander. Broughton proceeded to follow Ybarra and was about to turn onto the street that contained the entry gate of Wheeler Army Airfield. While both cars were waiting in stopped traffic, Ybarra left his car and approached Broughton's window while yelling at him. Broughton removed his service weapon from its holster and placed it on his lap, fearing that Ybarra may have been armed. Broughton claims he returned the weapon to its holster once he determined that Ybarra was unarmed. Broughton denies raising his weapon and denies pointing the gun at any part of Ybarra's body. (ECF No. 15.)

III.   **APPLICABLE LAW**

    A.   **PROCEDURAL LAW**

Commander Broughton has appropriately requested pre-trial dismissal of this prosecution pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure on Supremacy Clause grounds. Rule 12(b) provides that "[a]ny defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion." The Advisory Committee Notes accompanying Rule 12 specifically recognize immunity from prosecution as one of the defenses that a criminal defendant appropriately

may raise in a pre-trial motion, stating:

> [i]n the other group of objections and defenses, which the defendant at his option may raise by motion before trial, are included all defenses and objections which are capable of determination without a trial of the general issue. They include such matters as former jeopardy, former conviction, former acquittal, statute of limitations, ***immunity***, lack of jurisdiction, [and] failure of indictment or information to state an offense.

> Adv. Comm. Notes to Fed. R. Crim. P. 12 (emphasis added).

Consistent with the Advisory Committee Notes, federal courts have held that where a criminal defendant claims immunity from prosecution under the Supremacy Clause, the matter is appropriately decided on a Rule 12(b) motion to dismiss. In the leading case of *Kentucky v. Lona*, 837 F.2d at 727, the United States Court of Appeals for the Sixth Circuit, citing the language of Rule 12(b) and the Advisory Committee Notes, held that "as a general proposition, . . . a Rule 12(b) motion is a proper vehicle by which to assert the defense of immunity under the Supremacy Clause of the United States Constitution." *Id.* at 750. The Court explained that:

> [T]here comes a point early in the proceedings where the federal immunity defense should be decided in order to avoid requiring the federal officer to run the gauntlet of standing trial and having to wait until later to have the issue decided.
> * * *
> [The] goal [of the *In re Neagle* line of cases] is not only to avoid the possibility of conviction of a federal agent, but also to avoid the necessity of undergoing the entire process of the state criminal procedure. Accordingly, we hold that when the Supremacy Clause is raised as a defense by a federal officer charged with a state crime, the court has a duty to make a prompt ruling on that issue.

*Id.* at 752 (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526-27 (1985), and *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)).

Applying these principles in *City of Jackson v. Jackson*, 235 F. Supp. 2d 532 (S.D. Miss. 2002), the United States District Court for the Southern District of Mississippi dismissed a state criminal prosecution for stalking against a federal employee after determining that evidence presented on a Rule 12 motion supported the defendant's entitlement to immunity under the Supremacy Clause. *See also Texas v. Carley*, 885 F. Supp. 940, 944 (W.D. Tex. 1994); *Connecticut v. Marra*, 528 F. Supp. 381, 387 (D. Conn. 1981).

In *Idaho v. Horiuchi*, 1998 U.S. Dist. LEXIS 7667, pg. 16 (D. Idaho May 14, 1998), the United States District Court for the District of Idaho utilized the Sixth Circuit's analysis in *Lona* in holding that a Supremacy Clause immunity defense is properly raised as a Rule 12(b) motion. There, the Court noted that it had found no cases in which a trial court had deferred ruling on a defense of immunity under the Supremacy Clause until after all of the evidence was presented to the jury, or had left the issue for resolution by the jury. *Id.* at 17. Thus, the court concluded that it was mandated by Rule 12(b) to determine early on whether or not the record supported the theory that the officer's actions were necessary and proper in accordance with the *In re Neagle* line of cases. The Court noted that this determination was separate and apart from what might

later be jury issues, concerning reckless, careless, or negligent operation of a firearm. *Id.* at 18.

On appeal, the United States Court of Appeals for the Ninth Circuit reversed the lower court's dismissal, *Idaho v. Horiuchi,* 253 F.3d 359 (9th Cir.) *vacated as moot* 266 F. 3d 979 (9th Cir. 2001), but provided further guidance in relation to the timing of a determination of Supremacy Clause immunity. While also noting that there is practically no law on the subject, the court concluded that any factual issues raised by a motion to dismiss based on immunity must be resolved by the District Court prior to trial, and that if any conflicting evidence was presented related to the issue of immunity, those factual disputes must be resolved by the District Court as well. 253 F.3d at 374.

The Ninth Circuit went on to find significant policy reasons for a District Court to decide the issue of immunity at the motion to dismiss stage. First, the Ninth Circuit noted that Supremacy Clause immunity is a matter of federal law and would likely result in confusion if presented to a state jury at the same time as a defense pursuant to state justification law. *Id.* at 375. Significantly, the Court also noted that having a district court decide the immunity issue before a state prosecution could proceed would act as a "substantial safeguard against frivolous or vindictive criminal charges by states against federal officers." *Id.* at 376. For these reasons, the Court concluded that interposing a federal judge between the state prosecutor and the jury would provide significant restraint on

overzealous state prosecutions, and ensure that prosecutions of federal officers remain *an avenue of last resort. Id.* at 376 (emphasis added).

The protection from criminal prosecution is so significant that the Supreme Court has recognized that federal criminal defendants claiming constitutional immunity are entitled not only to prompt determination of their immunity claim before trial, but an immediate interlocutory appeal of an adverse decision. *See Abney v. United States,* 431 U.S. 651, 660-61 (1977) (denial of a criminal defendant's immunity claim based on the Double Jeopardy Clause of the Constitution was immediately appealable), and *Helstoski v. Meanor,* 442 U.S. 500 (1979) (a Congressman claiming immunity from prosecution under the Speech and Debate Clause of the Constitution was entitled to immediate appellate review of an adverse decision on his immunity claim). *See also United States v. Clayborne,* 727 F.2d 842 (9th Cir.), *cert. denied,* 469 U.S. 829 (1984) (criminal defendant who argued that the constitutional principle of separation of powers precluded his criminal prosecution was entitled to an interlocutory appeal when his motion to dismiss was denied). These decisions are based on the principle that the claimed immunity was intended to protect defendants "not only from the consequences of the litigation's results, but also from the burdens of defending themselves." *Helstoski,* 442 U.S. at 508.

### B.   <u>SUPREMACY CLAUSE LAW</u>

The Supremacy Clause of the United States Constitution provides that

the laws of the United States constitute the "supreme Law of the Land," and that "the Judges in every State shall be bound thereby, any [T]hing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI. It is a "seminal principle of our law" under the Supremacy Clause that "the activities of the Federal Government are free from regulation by any state" except to the extent that Congress expressly provides to the contrary. *Hancock v. Train,* 426 U.S. 167, 178 (1976). The Supremacy Clause was designed to ensure that states do not "retard, impede, burden, or in any manner control" the execution of federal law. *McCulloch v. Maryland,* 17 U.S. 316 (1819).

In *Tennessee v. Davis,* 100 U.S. 257 (1880), the Supreme Court held that federal officials are entitled to broad protection from state prosecution for the performance of federal duties. This protection is essential under the Supremacy Clause because:

> [The United States] can only act through its officers and agents, and they must act within the States. If, when thus acting, and within the scope of their authority, those officers can be arrested and brought to trial in a State court, for an alleged offense against the law of the State, yet warranted by the Federal authority they possess, and if the general government is powerless to interfere at once for their protection, - if their protection must be left to the action of the State court, - the operations of the general government may at any time be arrested at the will of one of its members. . .
>
> We do not think such an element of weakness is to be found in the Constitution...No state government can exclude [the United States] from the exercise of any authority conferred upon it by the Constitution, obstruct its authorized officers

against its will, or withhold from it, for a moment, the cognizance of any subject which that instrument has committed to it. *Id.* at 263.

The Supremacy Clause provides broad protection against state prosecution as long as the federal officer reasonably believed the conduct at issue was necessary and proper to the performance of his federal duties. This fundamental principle was delineated by the Supreme Court in its landmark decision, *In re Neagle,* 135 U.S. 1 (1890). *Neagle* arose from a California state criminal prosecution for murder against a federal marshal who was indicted because he shot and killed a citizen who was menacing a justice of the Supreme Court which the marshal was assigned to protect. At the time of the shooting, the citizen was actively threatening the justice, and the marshal reasonably, albeit mistakenly, believed that the citizen was armed. *Id.* at 53-54. In granting the marshal's habeas corpus petition to be released from state custody on Supremacy Clause grounds, the Supreme Court held that federal officials are immune from state prosecution for conduct they perform within the scope of federal employment that they reasonably believe is necessary and proper to the performance of their federal duties. The Supreme Court explained:

> To the objection made in argument, that the prisoner is discharged by this writ from the power of the state court to try him for the whole offense, the reply is, that if the prisoner is held in the state court to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do as marshal of the United States, and if in doing that act he did no more than

13

> what was necessary and proper for him to do, he cannot be guilty of a crime under the law of the State of California. When these things are shown, it is established that he is innocent of any crime against the laws of the State, or of any other authority whatsoever.

*Id.* at 75.

The Ninth Circuit applied the same reasoning in *Clifton v. Cox,* 549 F.2d 722 (9th Cir. 1977), in dismissing a state criminal prosecution initiated against a federal law enforcement official for mistakenly killing an unarmed citizen in the course of a federal raid. In *Clifton,* task force officers arrived at a ranch via helicopter to execute arrest and search warrants for an illegal drug manufacturing operation. As the officers exited the helicopter, one officer tripped and fell. However, in the noise and commotion of the helicopter landing, Agent Clifton thought the fallen officer had been shot. In response, Clifton rushed into the cabin and saw the only occupant running out of the cabin into a wooded area. Agent Clifton shouted "Halt" twice, and when the fleeing person failed to stop, he fired at him. The individual, who was unarmed, died en route to the hospital. The Ninth Circuit concluded that Agent Clifton could not be held criminally liable in state court for the shooting. In dismissing the state prosecution, the Ninth Circuit emphasized that the test for immunity under the Supremacy Clause turns upon the federal officer's reasonable belief in the propriety of his action at the time, which was established by the officer's factual submission. Although subsequent investigation revealed that the man

was unarmed and posed no threat to the officers, "[p]roper application of...[the Supremacy Clause] standard does not require a petitioner to show that his action was in fact necessary or in retrospect justifiable, only that he reasonably thought it to be." *Id.* at 726-27.

Many other federal court decisions have held federal officials immune from state prosecution under the Supremacy Clause. In *Johnson v. Maryland,* 254 U.S. 51, 57 (1920), the Supreme Court held that the state could not prosecute a post office employee for delivering mail without a state driver's license. In *Kentucky v. Long,* 837 F.2d 727, 752 (6th Cir. 1988), and *Baucom v. Martin,* 677 F.2d 1346, 1350 (11th Cir. 1982), the Sixth and Eleventh Circuits held respectively that federal agents who participated in undercover operations that allegedly violated state burglary and bribery laws were immune from state prosecution. *In In re McShane,* 235 F.Supp. 262, 274 (N.D. Miss. 1964), the district court in Mississippi determined that a federal agent who fired tear gas into a disruptive crowd could not be prosecuted by the state. The important principle underlying all of these decisions is that under the Supremacy Clause, federal officials acting within the scope of their federal employment are immune from state prosecution for any action they take that they reasonably believe is necessary and proper to the performance of their federal functions. This immunity from state prosecution fully covers discretionary conduct that is not mandated by any federal law, rule, or regulation. It also covers

unauthorized and even unlawful conduct arising from honest mistakes or errors of judgment. It does not matter that the conduct may later be determined to have been unjustified; it matters only that the officer reasonably believed that the conduct was necessary and appropriate at the time.

The United States Supreme Court, *In re Neagle*, 135 U.S. 1, 10 S. Ct. 658, 34 L.Ed. 55 (1890), stated:

> If the prisoner is held in the state court to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do . . . , and if in doing that act he did no more than what was necessary and proper for him to do, he cannot be guilty of a crime under . . . [state] law. . . .

*Id.* at 75.

### 1.  The Official Duty Inquiry

*In re Neagle* requires an initial inquiry into whether the acts of a federal agent were undertaken pursuant to his official duty. *In Re McShane's* Petition, 235 F. Supp. 262, 273 (N.D. Miss. 1964). A federal agent must show a causal connection between his official authority and the conduct with which he is charged. *People v. Zidek,* 691 F. Supp. 1177 (N.D. Ill. 1988).

Here, Commander Broughton's official authority justifies his investigation of Mario Ybarra.  Ybarra's excessive speed and dangerous tailgating, combined with his aggressive and irrational physical actions were the catalyst for Commander Broughton's actions. Under Hawaii law, following too

closely is an offense pursuant to Hawaii Revised Statute ("HRS") § 291C-50. Although a HRS § 291C-50 offense constitutes a "violation," rather than a felony or misdemeanor, *see* HRS § 701-107, a Hawaii Attorney General Opinion states that a police officer can arrest an individual for an offense classified as a violation. Haw. Op. Att'y Gen. No. 76-4 (1976). Commander Broughton believes that he was justified in his actions under 40 U.S.C. § 1315(b) (2) (c), because Ybarra's speed, tailgating and aggressive and irrational behavior provided him with reasonable suspicion to conduct a traffic stop and/or to continue to investigate Ybarra's driving.

### 2.   The "Necessary and Proper" Inquiry

The second *Neagle* inquiry is whether the federal agent's actions were no more than "necessary and proper" to carry out his duty. This standard is met by satisfying two conditions: (1) the actor must subjectively believe his action was justified; and (2) his belief must be objectively reasonable.[1] *Whitehead v. Senkowski,* 943 F.2d 230, 234 (2nd Cir. 1991); *see also Long,* 837 F.2d at 745 ("On the subjective side, the agent must have an honest belief that his action was

---

[1] The Ninth Circuit has questioned, but left unresolved, whether inclusion of a subjective component is appropriate in light of the Supreme Court's decision in *Harlow v. Fitzgerald,* 457 U.S. 800, 817-18 (1982), which held that qualified immunity should depend on whether the official acted in an objectively reasonable manner, without reference to subjective intentions. *Idaho v. Horiuchi*, 253 F.3d 359, 366 n.11 (9th Cir. 2001) *(en B a n c),* vacated as moot, *979(9th Cir.*2001) *(en banc.)*

justified. On the objective side, his belief must be reasonable"). A defendant, however, need not "show that his action was in fact necessary or in retrospect justifiable, only that he reasonably thought it to be." *Clifton v. Cox,* 549 F.2d 722, 728 (9th Cir. 1977). As a result, this Court must view the circumstances as they appeared to Commander Broughton at the time of the incident. *See id.* at 728-29; *Graham v. Connor,* 490 U.S. 386, 396-97, 109 S. Ct. 1865, 104 L.Ed. 443 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . allowing for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving. . . ."); *United States v. Lipsett,* 156 F. 65, 71 (W.D. Mich. 1907) (federal officer is "not liable to prosecution in the state court from the fact that from misinformation or lack of good judgment he transcended his authority").

Errors in judgment in what a federal officer conceives to be his legal duty will not, alone, serve to create criminal responsibility. *In re Fair,* 100 F. 149 (D. Neb. 1900) (soldiers shoot escapee based on questionable orders); *In re Lewis,* 83 F. 159 (D. Wash. 1897) (U.S. Treasury employees who wrongfully seized papers granted writ of habeas corpus). A federal officer exceeding his express authority does not necessarily strip himself of his lawful power to act under the scope of authority given to him under the laws of the United States. *Clifton v. Cox,* 549 F.2d at 728. The standard by which the act committed by a federal

officer will be measured considers the reasonableness and integrity of his actions in light of the circumstances as they appeared to him when he acted. *In Re McShane's Petition,* 235 F. Supp. at 273. A federal officer is entitled to release if the evidence reveals he had a reasonable belief under the circumstances that his actions were necessary at that time. *See, e.q., United States ex rel. McSweeney v. Fullhart,* 47 F. 802 (W.D. Pa. 1891) ("did he do more than was necessary and proper for him to do under the circumstances? This must be decided by under all the circumstances, and keeping in mind the situation of the deputies when compelled to decide upon a course of action"); *In re Lewis,* 83 F. 159 (D. Wash. 1897) ("all they did was in an official capacity, without any private or individual malice, and without any felonious intent to commit a robbery or to do a criminal act."); *In re Neagle,* 135 U.S. at 75-76 ("that in taking the life of Terry, under the circumstances, he was acting under the authority of the law of the United states, and was justified in so doing; and he is not liable to answer in the courts of California on account of his part in that transaction").

Once a threshold defense of immunity is raised, the State of Hawaii bears the burden of "coming forward with an evidentiary showing sufficient at least to raise a genuine factual issue whether the federal officer was . . . doing no more than what was necessary and proper for him to do in the performance of his duties." *Lonq,* 837 F.2d at 752. The State cannot meet its burden "merely by

way of allegations." *Id.; see also City of Jackson v. Jackson,* 235 F. Supp.2d 532, 534 (S.D. Miss. 2002) (stating that when "Supremacy Clause immunity defense [is raised] by way of motion to dismiss, the district court should grant the motion in the absence of an affirmative showing by the state that the facts supporting the immunity claim are in dispute").

While Commander Broughton was driving along H2 on Oahu, Hawaii, Ybarra's vehicle began dangerously tailgating him while traveling at a high rate of speed. Commander Broughton turned on his rear emergency lights in an effort to warn Ybarra. As Commander Broughton was exiting the freeway Mr. Ybarra pulled along side Commander Broughton and leaned over the passenger side of his vehicle and "began violently displaying his middle finger" and yelling.  Due to the location of the altercation on H2, Commander Broughton suspected that Ybarra was a military member and he assumed that Ybarra was heading to the Army installation located off of H2. Commander Broughton decided to report Ybarra's behavior (a violation of 18 USC III and suspected anger management/PTSD) to his military commander.

Commander Broughton followed Ybarra to obtain his license plate and registered owner information from FPS dispatch.  Thereafter, Ybarra abruptly stopped in the middle of traffic lane and proceeded to leave his vehicle and approach Commander Broughton's driver side window, while yelling at him. When Commander Broughton saw Ybarra approaching the vehicle, fearing that

Ybarra may have been armed Broughton removed his service weapon from its holster and placed it above his lap, in a tactical ready position.  Commander Broughton stated that he returned the weapon to its holster once he determined that Ybarra was unarmed.

Ybarra alleges that Commander Broughton placed his service weapon on his chest and asked Ybarra "if he had a problem." Ybarra claims that at that point he raised his arms, went back to his car, and departed the area. On the contrary, Commander Broughton adamantly denies that he raised his weapon and certainly did not point it at any part of Ybarra's body.

Commander Broughton believed that there was reasonable suspicion to make a traffic stop based on Ybarra's driving and behavior. Additionally, after Officer Broughton began his investigation, Ybarra's actions constituted a violation of 18 U.S.C. 111. 18 U.S.C. 111 provides:

> Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both . . . .

18 U.S.C. § 111(a) (1).

When Ybarra approached Commander Broughton's parked car near the gate entrance, Ybarra violated 18 U.S.C. § 111 because Ybarra attempted to intimidate Broughton and interfere with Broughton's investigation while he was

acting in performance of his official duties. Commander Broughton's actions when Ybarra approached were within the scope of his enumerated police powers. An FPS law enforcement officer has the power to make arrests without warrant for misdemeanors committed in their presence and felonies based on probable cause. *See* 40 U.S.C. § 1315 (b) (2) (c).

Commander Broughton subjectively believed that he was justified in his initial investigation of Ybarra due to his reckless high speed, dangerous tailgating and irrational behavior.  Objectively, Commander Broughton's follow-up investigation which led to the confrontation was justified based on his observation of Ybarra abruptly stopping in the middle of a traffic lane and proceeded to leave his vehicle and approach Commander Broughton's driver side window, with pre-assault indicators, while yelling at Broughton.

Accordingly, the State of Hawaii will not meet its burden of "coming forward with an evidentiary showing sufficient at least to raise a genuine factual issue whether the federal officer was . . . doing no more than what was necessary and proper for him to do in the performance of his duties." *Long*, 837 F.2d at 752.

Commander Broughton disputes Mr. Ybarra's allegation that he placed his weapon into Ybarra's chest.  To do so would have placed Broughton in the position of extreme danger as Ybarra was trained by the military in disarming/redirecting weapons drawn on him.

IV.    **CONCLUSION**

The evidence establishes that Commander Broughton is a federal employee of the department of Homeland Security, and was, at the time of the events alleged in the Complaint, a law enforcement officer of the United States for purposes of 28 U.S.C. § 1442(a)(1). The evidence will establish that there was a causal nexus between his actions and the charge against him. The evidence will further establish that his conduct in investigating Ybarra, was "necessary and proper" under the circumstances as perceived by Broughton. *Clifton v. Cox,* 549 F.2d 722, 728 (9th Cir. 1977). Additionally, the evidence will establish that Broughton subjectively believed his action was justified and his belief was objectively reasonable. *Whitehead v. Senkowski,* 943 F.2d at 234. Moreover, the evidence will establish that Commander Broughton was even justified under Hawaii law in using force to protect himself under the circumstances presented.

Therefore, the criminal prosecution should be dismissed given that Commander Broughton's actions were no more than necessary and proper under the circumstances. *In re Neagle,* 135 U.S. 1 (1890).

DATED: Honolulu, Hawaii, September 16, 2013.

Law Offices Of:
HARRISON & MATSUOKA

/s/    William A. Harrison
WILLIAM A. HARRISON

23