IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| STATE OF HAWAI'I, ) | CR. NO. 13-00415 HG |
| ) | |
| Plaintiff, ) | **DECLARATION OF WILLIAM A.** |
| ) | **HARRISON** |
| vs. ) | |
| ) | |
| CHARLES ERIC BROUGHTON, ) | |
| Also known as Eric Broughton, ) | |
| ) | |
| Defendant. ) | |

## DECLARATION OF WILLIAM A. HARRISON

WILLIAM A. HARRISON, being first duly sworn on oath, deposes and says:

1. Declarant is attorney of record for Commander CHARLES ERIC BROUGHTON ["Commander Broughton;" "Broughton"] in the above-captioned matter having been retained by the United States Department of Justice to represent Commander Broughton;

2. Declarant has interviewed Broughton and reviewed Broughton's curriculum vitae, and on information and belief states as follows:

3. Commander Broughton has been a law enforcement officer for over 22 years, in the following positions:

- 2 years Federal Protective Service:
  - Area Commander, Sacramento, CA;
  - Area Commander, Honolulu, HI;
- 14 years Fresno County Sheriff's Office (CA), retired at the rank of Deputy Sheriff Sergeant:
  - Supervised, managed and participated in tactical enforcement teams for much of that time;
  - Involved in multiple use of force and deadly force encounters;
  - Law enforcement instructor;
- 6 years Livingston Police Department (CA);

4. Broughton has over 30 years of military experience, retiring as an Air Force Chief Master Sergeant (E-9) in July of 2013. While in the military he has training in Security Forces (Law Enforcement) additionally he was a Police Trainer, Police Training Manager, Senior Enlisted Manager, and command-level staff manager (PACAF);

5. In addition to the above Broughton has the following professional training and education:

- Bachelor of Science degree in Criminal Justice at American Military University;

- Specific studies in law enforcement and military deadly force encounters and post-traumatic stress:

    i. Grossman, D., *On Killing: The Psychological Cost of Learning to Kill in War and Society*, Little, Brown and Co, 1995;

    ii. Grossman, D., *On Combat: The Psychology and Physiology of Deadly Conflict in War and in Peace*, WSG Research Publications, 2004;

- Over 3,500 hours of professional law enforcement training:

    - Three basic law enforcement academies, with large portions devoted to use of force and officer safety:
        - Air Force Security Police Academy;
        - California Basic Police Academy;
        - Federal Law Enforcement Training Center ("FLETC") Uniformed Police Training Academy;
        - Over 100 hours of advanced officer training devoted specifically to tactics;

7. Attached hereto as Attachment "1" is a true and correct copy of the curriculum vitae of Broughton;

8. Declarant has reviewed all investigative reports, records,

3

audio and writing in this matter and on information and belief provides the following facts which will be offered at the hearing in support of this motion:

      (a)   On December 20, 1012, Broughton was on-duty, dressed in an FPS law enforcement uniform, driving a marked FPS police vehicle (Chevrolet Tahoe);

      (b)   At about 1520 hrs, Broughton observed a vehicle approach him from the rear at a high rate of speed. Once the vehicle caught up to his police vehicle it maintained a dangerously close and unsafe separation between the two vehicles. Broughton flashed his rear emergency lights in an effort to warn the driver of the offending vehicle to maintain a proper and safe distance;

      (c)   Broughton took no further enforcement action at the time relative to the tailgating and excessive speed, both of which are violations of state laws, occurring in his presence;

      (d)   Broughton continued approximately two miles and then positioned his police vehicle in the freeway exit lane, while the offending vehicle positioned itself immediately to his left. The driver leaned over into the passenger seat area while driving with his left hand, and then with an expression of rage on his face, wildly shook his right fist and middle finger at Broughton, while yelling something unintelligible. There was a female in the

audio and writing in this matter and on information and belief provides the following facts which will be offered at the hearing in support of this motion:

    (a)   On December 20, 1012, Broughton was on-duty, dressed in an FPS law enforcement uniform, driving a marked FPS police vehicle (Chevrolet Tahoe);

    (b)   At about 1520 hrs, Broughton observed a vehicle approach him from the rear at a high rate of speed. Once the vehicle caught up to his police vehicle it maintained a dangerously close and unsafe separation between the two vehicles. Broughton flashed his rear emergency lights in an effort to warn the driver of the offending vehicle to maintain a proper and safe distance;

    (c)   Broughton took no further enforcement action at the time relative to the tailgating and excessive speed, both of which are violations of state laws, occurring in his presence;

    (d)   Broughton continued approximately two miles and then positioned his police vehicle in the freeway exit lane, while the offending vehicle positioned itself immediately to his left. The driver leaned over into the passenger seat area while driving with his left hand, and then with an expression of rage on his face, wildly shook his right fist and middle finger at Broughton, while yelling something unintelligible. There was a female in the

passenger seat however Broughton's view into the offender's car was unobstructed;

   (e) Based upon the driver's physical appearance, and proximity to Schofield Army Barracks/Wheeler Army Airfield, combined with Broughton's 30+ years of military experience, Broughton reasonably concluded the driver was a military member, subject to federal jurisdiction under the Uniform Code of Military Justice;

   (f) It was well publicized that the 25th Infantry Division had recently returned from a combat deployment overseas.  Further, it was well known within the Oahu law enforcement and military communities, of a marked increase in suicides, domestic violence and other anger management incidents within the 25th Infantry Division;

   (g) Commander Broughton observed that the driver was exhibiting objective symptomology of anger management and self-control issues commonly associated with post-traumatic stress disorder. i.e., aggressive driving, aggressive behavior and irrational behavior by displaying open aggression toward authority/law enforcement;

   (h) Based upon the totality of circumstances, Broughton chose to investigate further. Broughton reentered the freeway via the onramp and overtook the vehicle about one mile later when the driver took an exit and

5

stopped at a stop sign.  Both vehicles turned left and Broughton was able to see the rear license plate, which he wrote onto a notepad;

    (i)  Both vehicles turned right and Broughton remained behind the vehicle while he phoned the FPS Denver Mega Center ["DMC"], dispatch center in an effort to obtain registration information related to the vehicle;

    (j)  While on the phone, the driver slowed, then suddenly and without cause or warning stopped in the middle of a busy lane of traffic.  The driver got out of his vehicle and quickly walked back towards Broughton's clearly marked police vehicle;

    (k)  This behavior by a motorist towards a police office is aggressive and irrational. Which action further reinforced Broughton's belief the driver was exhibiting anger management issues related to PTSD;

    (l)  Moreover the driver was exhibiting pre-assault indicators such as:

- forcing Broughton to stop behind him in traffic;
- leaving his vehicle in traffic;
- leaning forward at the waist;
- approaching a police vehicle quickly;

- displaying tight and pursed lips, a furrowed brow, and a red face; and

- yelling as he approached, which Broughton interpreted as rage based upon his law enforcement experience of over 22 years;

(m)   These pre-assault indicators, combined with his belief the driver was a combat soldier displaying objective signs of anger management and self-control issues commonly associated with PSTD caused Broughton concern;

(n)   Commander Broughton was at a tactical disadvantage as he was:

- stopped behind the vehicle in traffic;

- unable to safely change lanes or go around due to his focus on the immediate threat presented by the driver approaching his vehicle while displaying pre-assault indicators;

- his left hand was occupied with his cellphone as he was speaking with FPS DMC Dispatch;

- his police vehicle remained in gear with his left foot on the brake; and

- he was securely belted in the driver's seat;

(o) Broughton prepared to defend himself and repel the approaching threat. He unlocked his seatbelt with right hand, drew his handgun from the holster and held it horizontally across his midriff in a tactical ready position;

(p) This would allow Broughton to:

- shoot through the door at a threat if necessary, but keep the handgun out of view under normal circumstances;

- focus on the driver, while looking for obvious weapons;

- activate the driver's window opening mechanism;

- continue to converse with DMC Dispatch to keep them informed regarding the problem he was experiencing on the roadway; and

- position his left hand/arm on the window sill as a potential defensive block;

(q) The driver yelled at Broughton demanding his name and badge number from a distance just beyond the Tahoe driver's side mirror (about two feet). Commander Broughton told the driver that he was blocking

traffic and that if he wanted to speak the parties should pull off of the roadway so as to free up traffic;

(r) Broughton intentionally chose not to exit his police vehicle, concerned that doing so would escalate the incident into a physical encounter;

- in or immediately adjacent to the roadway;
- with no backup or the ability to call for backup; and
- with a subject believed to be a PTSD affected soldier who has significant close quarters combat and firearms training;

(s) The driver continued his demand and Broughton repeated his instruction a second time;

(t) The driver leaned closer as if to examine Broughton's badge and then suddenly turned and walked/jogged quickly back to his car replying that he did not have to pull over;

(u) At some point during this short exchange, Broughton saw no weapons in the driver's hands and no further indication he was otherwise armed, therefore Broughton re-holstered his handgun;

(v) Traffic continued to pass the two vehicles stopped in the right lane, and the vehicles behind them were blocked in the left lane;

(w) Broughton called after the driver and asked if he was in the military, to which the driver responded that it was - "none of your fucking business;"

(x) The driver got back into his car and began driving away. As the vehicle departed Broughton drove past and to the right side of the vehicle and slowed slightly forward of it to try to record the military base sticker numerals located on the windshield (DD-2220). As he did so the driver sped up slightly as if to prevent Broughton from observing the front of the car and proceeded to match the speed of Broughton's vehicle. Broughton asked through the open windows "what the problem was." Broughton also asked why the driver "flipped him off" earlier. At this the female passenger responded "leave us alone;"

(y) Broughton broke contact with the vehicle and occupants and drove away. Broughton continued to observe the vehicle in his rear view mirror until it turned off of the roadway at the entrance to Wheeler Army Airfield. Broughton re-telephoned DMC Dispatch, advised them of the incident and obtained the vehicle registration information. Broughton drove directly to the Schofield Barracks Military Police headquarters to further investigate where the driver was assigned. After confirming the information, Broughton drove directly to the driver's assigned command and informed the

on-duty supervisors of the incident; as well as, his observations and suspicion that the driver was exhibiting behavior commonly associated with PTSD;

(z)     Upon conclusion of the incident, Broughton again phoned DMC Dispatch, advised them of the outcome of the investigation and requested an incident number in which to document the event;

9.     Broughton disputes Mr. Ybarra's allegation that Broughton placed his weapon into Ybarra's chest. To do so would have placed Broughton in the position of extreme danger as Ybarra was trained by the military in disarming/redirecting weapons drawn on him;

I DECLARE UNDER PENALTY OF PERJURY THAT THE STATEMENTS HEREIN ARE TRUE AND CORRECT TO THE BEST OF MY INFORMATION AND BELIEF.

    /s/ William A. Harrison
WILLIAM A. HARRISON